Filed 3/14/25  In re N.T. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re N.T., a Minor. | D084828 |
| S.T.,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>T.B.,<br><br>        Defendant and Appellant. | (Super. Ct. No. 23AD000095C) |

APPEAL from an order of the Superior Court of San Diego County, Tilisha Martin, Judge.  Affirmed.

Marcus Family Law Center and Christopher McDonough, for Defendant and Appellant.

Jack A. Love, under appointment by the Court of Appeal, for Plaintiff and Respondent.

This is the third[1] appeal of T.B. (Mother), after her three attempts to terminate the parental rights of S.T. (Father) to their minor son N.T. (Minor).

---

1    The parties in this high-conflict case have been embroiled in litigation in the family and juvenile courts for about a decade.

In her freedom from parental custody and control (FFCC) petition (Fam. Code, § 7800 et seq.[2]), as amended (Petition), Mother contended Father abandoned Minor between September 2021 and February 2023 for purposes of section 7822, subdivision (a)(3), which provides a procedure for termination of parental rights under specified conditions. The juvenile court, in its 31-page August 8, 2024 final written ruling after trial (August 8 Final Ruling and Order), denied the Petition, finding Mother failed to prove by clear and convincing evidence that (1) Father intended to abandon Minor and (2) it was in Minor's best interest to terminate Father's parental rights.

On appeal, Mother contends the juvenile court erred when it (1) refused to replace San Diego County Health and Human Services Agency (Agency) with a new investigator to investigate what Mother claims were "contested facts" between the parties bearing on the best interests of Minor; (2) allegedly applied an incorrect legal standard in determining Minor's best interest; and (3) granted the motion to quash the testimony of a family court services (FCS) counselor from the parties' stayed dissolution case and to exclude the counselor's confidential FCS report.

As we explain, we conclude the juvenile court did not err in refusing to appoint a new family investigator because the investigator's report, as supplemented, met all statutory requirements and any purported deficiency in the report went to the weight of the evidence. We also conclude the court did not apply an incorrect legal standard in determining Minor's best interests and properly exercised its discretion in granting the motion to quash. We therefore affirm the August 8 Final Ruling and Order.

---

[2] All further undesignated statutory references are to the Family Code.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

### A. *Overview*

Mother and Father married in 2004 and had one child, Minor, who was born in 2013. Mother filed for divorce in 2015, which proceeded in family court and resulted in a status-only dissolution judgment in 2016. That same year, over Father's objection, the court granted Mother's request to relocate from San Diego to Michigan with Minor, and gave Father visitation.

Father was out of contact with Minor from December 2016 through April 2018, spending much of this time in custody with U.S. Immigration and Customs Enforcement (ICE). Upon release, Father sought ex parte relief in the family court to visit Minor, claiming Mother had prevented contact with the child. In April 2018, the court granted Father's request for ex parte Skype reunification therapy with Minor and ordered the parties to participate in a high-conflict parenting program. In August 2018, the court granted Mother sole legal and physical custody of Minor, with Father continuing to have visitation.

In early 2019, the family court denied Mother's request to decrease Father's Skype visits with Minor. By that time, Father and Minor had visited about 80 times. Father subsequently filed a motion requesting in-person reunification therapy with Minor.

### B. *First Petition*

In July 2019, while Father's motion was pending in the family court, Mother filed an FFCC petition in the juvenile court seeking to terminate

---

[3] We summarize the facts in the record by presenting them in a light most favorable to the juvenile court's August 8 Final Ruling and Order. (See *In re Shelley J.* (1998) 68 Cal.App.4th 322, 329.)

3

Father's parental rights.  As a result of the petition, the family court proceedings were stayed.[4]

In March 2020, the juvenile court denied the petition based on claim and issue preclusion.  The court relied on findings made by the family court that Minor had a "good relationship" with Father and that Father had made efforts to pursue contact and reunification with Minor in 2018 and 2019.  The juvenile court added it was 'incomprehensible . . . that [it] would find that [Father] intended to abandon [Minor] and that legally severing his relationship with his child after five years of litigation during which he continually sought contact would be in [Minor's] best interests"; and that Minor's "best interests have been at the heart of previous litigation over the course of years."

Mother appealed.  (*Tanya B. v. Steven T.* (Nov. 25, 2020), D077580 [nonpub. opn.].)  We subsequently dismissed the case due to her untimely notice of appeal.[5]

## C.  *Second Petition*

Mother filed her second FFCC petition in the juvenile court in February 2021.  Mother again alleged that Father did not communicate with

---

[4]     Section 7807, subdivision (b) provides in part:  "[A]ny motion or petition for custody or visitation filed in a proceeding under this part shall be stayed. The petition to free the minor from parental custody and control under this section is the only matter that may be heard during the stay until the court issues a final ruling on the petition."

[5]     On our own motion, we take judicial notice of our prior opinions in this case.  (Evid. Code, §§ 452, subd. (d)(1), 459, subd. (a); *Epic Communications, Inc. v. Richwave Technology, Inc.* (2015) 237 Cal.App.4th 1342, 1347, fn. 3 [" 'a court may take judicial notice of the contents of its own records' "].)

Minor between December 2016 and April 2018 and claimed that "[t]he circumstances in this case have not changed."

The juvenile court appointed the Agency to evaluate the possible termination of Father's parental rights. The court also appointed Minor counsel, who recommended that Minor travel to California and meet with Father.

In September 2021, the juvenile court denied Mother's second petition based on claim and issue preclusion, finding it was "simply an attempt to get a different ruling on the same facts." As before, the court lifted the stay and returned the case to the family court. Mother appealed and we affirmed the dismissal, concluding Mother was barred from relitigating the same abandonment issues in her successive petitions. (*T.B. v. S.T.* (July 15, 2022), D079696 [nonpub. opn.].)

In May 2022, Mother filed a motion in a Michigan court to change Minor's legal name. Father traveled to Michigan to contest the motion. In early 2023 the Michigan court denied Mother's request.

**D.** *The Petition and the Juvenile Court's Ruling*

Mother filed her third Petition in February 2023. She alleged that between September 24, 2021, and February 15, 2023, Father had voluntarily abandoned Minor for purposes of section 7822, subdivision (a)(3). Mother amended her Petition in March 2023.

In April 2023, the juvenile court appointed Father counsel. Later that year and as discussed in more detail *post*, the court denied Mother's request to appoint a new investigator to replace the Agency. The court set trial for mid-November 2023.

As also discussed *post*, in early November Mother filed a notice of lodgment regarding a confidential FCS report generated in the parties'

stayed dissolution case. In addition to seeking the report's admission into evidence, Mother served a civil subpoena on the FCS counselor who prepared the report. In response, counsel for the FCS counselor and the Superior Court of California, County of San Diego, filed a motion to quash, leading to a trial continuance. In December 2023 the juvenile court granted the motion to quash the subpoena.

Trial commenced in January 2024, and took place over multiple days. In late June Mother submitted a 29-page request for statement of decision that included 55 contested issues. Over Father's objection and to promote judicial expediency, the juvenile court in its August 8 Final Ruling and Order considered the principal controverted issues Mother raised, but did not consider any evidence or argument that was not presented during the trial.

In its August 8 Final Ruling and Order, the juvenile court found Mother failed to show by clear and convincing evidence that Father intended to abandon Minor. It thus denied the Petition, lifted the stay, and ordered the parties to return to family court to address any request for modification of the existing custody and visitation orders.

## DISCUSSION

### I. Statutory Framework

"Section 7822 provides a separate and distinct mechanism for terminating parental rights based on a parent's voluntary abandonment of a child." (*In re Aubrey T.* (2020) 48 Cal.App.5th 316, 325 (*Aubrey T.*).) Under this statute, if "[o]ne parent has left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent, with the intent on the part of the parent to abandon the child," a court may declare the child free from the parent's custody and control. (§ 7822, subd. (a)(3); *In re E.M.* (2014)

6

228 Cal.App.4th 828, 839 (*E.M.*) [" ' " 'In order to constitute abandonment there must be *an actual desertion,* accompanied with an intention to entirely sever, so far as it is possible to do so, the parental relation and throw off all obligations growing out of the same.' " ' "].) "A declaration of freedom from parental custody and control . . . terminates all parental rights and responsibilities with regard to the child." (§ 7803.)

"[A] section 7822 proceeding to terminate parental rights is appropriate 'where three main elements are met: (1) the child must have been left with another; (2) without provision for support or without communication from the parent for the statutory period; and (3) with the intent on the part of the parent to abandon the child.' " (*Aubrey T., supra*, 48 Cal.App.5th at p. 326.) The court must act in the best interest of the child in a section 7822 proceeding. (§ 7890; see § 7801 ["This part shall be liberally construed to serve and protect the interests and welfare of the child."].)

" ' " '[The] question whether [an] intent to abandon exists and whether it has existed for the statutory period is a question of fact for the trial court, to be determined upon all the facts and circumstances of the case.' " [Citation.]' [Citation.] In making this determination, the court 'must objectively measure the parent's conduct, "consider[ing] not only the number and frequency of his or her efforts to communicate with the child, but the genuineness of" the parent's efforts.' " (*Aubrey T., supra*, 48 Cal.App.5th at p. 327.) The "failure to provide support[ ] or failure to communicate is presumptive evidence of the intent to abandon. If the parent or parents have made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent or parents." (§ 7822, subd. (b).)

7

The party who files a section 7822 petition has the burden of proving by clear and convincing evidence that all elements of section 7822 have been met. (*E.M., supra*, 228 Cal.App.4th at pp. 838–839.) " 'Clear and convincing' evidence requires a finding of high probability." (*In re Angelia P.* (1981) 28 Cal.3d 908, 919 [noting courts have also described this standard "as requiring that the evidence be ' "so clear as to leave no substantial doubt" and "sufficiently strong to command the unhesitating assent of every reasonable mind" ' "].)

## II. <u>Standards of Review</u>

" '[T]he decision to terminate parental rights lies in the first instance within the discretion of the trial court, "and will not be disturbed on appeal absent an abuse of that discretion." ' " (*Adoption of A.B.* (2016) 2 Cal.App.5th 912, 924 (*A.B.*).) " 'When applying the deferential abuse of discretion standard, "the trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." ' " (*Ibid.*; accord, *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712.)

" 'Substantial evidence is "evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have made the requisite finding under the governing standard of proof." ' [Citation.] When reviewing a finding made under the clear and convincing evidence standard, we review the entire record to determine whether it contains 'substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.' (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.) We 'view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have

evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence.' (*Id*. at pp. 1011–1012.) ' "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' [Citation.]" (*In re K.M.* (2024) 102 Cal.App.5th 910, 914 (*K.M.*).)

### III. The Juvenile Court Did Not Err in Refusing to Postpone the Trial and Appoint a New Investigator

Mother contends we must reverse the juvenile court's August 8 Final Ruling and Order because the report of the Agency's investigator, Tina Jako, was flawed for two reasons:  first, Jako did not consider the best interests of Minor or investigate Mother's claims against Father, due to what Mother contends is the Agency's policy of recommending denial of an FFCC petition when there is no pending adoption; and second, the report did not satisfy the requirements of section 7851, subdivision (b).

### A. *Governing Principles*

Sections 7850[6] and 7851 require the juvenile court to notify a qualified investigator to investigate the circumstances of the child and the facts that may justify termination of parental rights under section 7822.  The investigator then files a report with the court for its consideration in ruling on a petition for termination of parental rights.

---

[6]    Section 7850 provides:  "Upon the filing of a petition under Section 7841, the clerk of the court shall, in accordance with the direction of the court, immediately notify the . . . qualified court investigator . . . , who shall immediately investigate the circumstances of the child and the circumstances which are alleged to bring the child within any provision of Chapter 2 (commencing with Section 7820)."

As relevant here, section 7851, subdivision (a) provides that an investigator "shall render to the court a written report of the investigation with a recommendation of the proper disposition to be made in the proceeding in the best interest of the child."  Subdivision (b) of this statute requires the report to include statements:  (1) explaining  the nature of the proceeding to the child; (2) conveying the child's feelings and thoughts concerning the proceeding and (3) attitude towards the parent or parents; and (4) informing the child of his or her right to attend the hearing on the petition.  Subdivision (d) requires the court to receive the report into evidence and consider it in ruling on the petition.  (§ 7851, subd. (d).)

"The 'statutory purpose of the report is to inform the court of the best interests of the child, and the interests of the children are fundamental to the proceeding,' so it is 'the trial court's obligation to read and consider the report sua sponte.' " (*In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1380 (*Noreen G.*).)  " 'Deficiencies in an assessment report surely go to the weight of the evidence, and if sufficiently egregious may impair the basis of a court's decision to terminate parental rights[,]' but are not prejudicial per se." (*In re Valerie W.* (2008) 162 Cal.App.4th 1, 14 (*Valerie W.*); accord, *Noreen G.,* at p. 1381.)

B.  *Additional Background*

During a hearing in August 2023, Mother argued the juvenile court should replace the Agency with a new investigator because of the Agency's policy of recommending dismissal of an FFCC petition when there is no pending adoption.  Father argued the court should reappoint Jako.  Minor's counsel agreed with Father, noting Jako had done "hundreds" of reports concerning FFCC petitions, was "very reliable" and "very honest," and understood the statutory requirements when preparing such reports.

In reappointing the Agency and Jako to conduct the section 7851 investigation and prepare the report, the juvenile court noted it would be the ultimate "decision-maker" regarding any potential bias. The court ordered Minor's interview to be conducted in-person in San Diego, after Jako "strongly" objected to Mother's request for a virtual interview.

## 1. The October 30 Report

At a hearing on October 31, 2023, Mother renewed her objection to the Agency acting as the investigator, one day after Jako filed her 13-page report recommending denial of the Petition. Mother argued the report was "essentially a statement of the history of the proceedings, the statement of what each parties' position is, and then a blanket statement" of the Agency's policy recommending denial of an FFCC petition when not accompanied by an adoption proceeding. Father argued Jako's October 30 report complied with section 7851 and contained "excellent information that will be very beneficial to the court." Minor's counsel agreed with Father.

The October 30 report included a chronology of events beginning when the parties met in 1999 through the date of the report; lengthy summaries of interviews of the parties; a summary of Minor's interview; and a recommendation by the Agency. The October 30 report stated: "This Agency does not support terminating a parent's parental rights when there is no pending adoption. This Agency believes the intent of . . . section 7822 is in relation to a pending adoption and not to simply take a parent's parental rights away."

During the in-person interview with Jako, Minor stated he lived at home with Mother. When asked if Father lived there, Minor responded, " 'I don't have a dad in my life.' " In follow-up questioning, Minor stated he did not know who his father was and had never received a "card, gift or letter"

11

from him.  Based on these answers, Jako did not ask Minor any further questions about Father.

The juvenile court ruled it would accept and consider the Agency's October 30 report, and reiterated it would make its decision on the Petition based on the totality of the evidence.

### 2.  Jako's Initial Trial Testimony

Jako has been investigating FFCC cases for about 22 years, as she is a social worker in the adoption section of the Agency.  In this capacity, she has written "thousands of reports and testified hundreds of times."

Jako reviewed "everything" given to her by trial counsel in preparing the October 30 report, but noted her practice was not to "provide specifics when a case is contested and is going to trial."  Instead, her report provides a "foundation," leaving it up to the attorneys to try their own cases and the juvenile court to decide what was in a child's best interest.

In explaining her recommendation of dismissal, Jako noted the Agency's philosophy is that section 7822 "is intended for purposes of an adoption" and that without such a companion proceeding dismissal was appropriate.  Despite the Agency's view, Jako testified that her October 30 report included "all the same information" she normally includes when she does an investigation in a case with a pending adoption.

At the conclusion of Jako's testimony, the juvenile court took a recess to review the applicable statutes.  The court noted that, in light of her testimony, it was "concerned" because the October 30 report did not appear to include a recommendation based on Minor's best interests.  Minor's counsel and Mother agreed with the court's assessment, and asked the court to postpone the trial and appoint a new investigator.

12

Father disagreed, arguing the section 7851 investigation and report did not require the investigator to address the portions of section 7822 regarding "abandonment, the intent to abandon, and what is in the best interests of the minor" in that context; and that Jako conducted a "full investigation" and her report met all the requirements of section 7851 in determining Minor's best interests.

The juvenile court then questioned Jako, noting that although Jako may have done a proper investigation, her purported failure to opine on the best interests of Minor was concerning. Jako clarified she "might have got[ten] a little tripped up on some of the questions" asked by the attorneys and it was her position and that of the Agency that dismissal of the Petition was in Minor's "overall best interest."

The juvenile court ruled it was "uncomfortable going forward without an independent investigator to actually do an investigation in line with [section] 7851[, subdivision] (a) and identify the disposition related to the investigation." The court ordered counsel to meet and confer to identify another investigator, and set a new hearing date.

### 3. The Agency Agrees to Supplement the October 30 Report

At the follow-up hearing held about a week later, counsel for the Agency made an appearance to address the Agency's investigation and report. Counsel represented the Agency had in fact considered the best interests of Minor in preparing its October 30 report; suggested there "was some confusion" regarding Jako's testimony "and where any analysis and best interest considerations fell"; and stated the Agency would agree to supplement the report "with any additional information the Court might request that it deems is relevant to the minor's best interest."

13

The juvenile court heard additional argument, including from Minor's counsel, who represented he had contacted the parties during the week and recommended they agree to supplement the October 30 report rather than retain a new investigator and start from scratch. Minor's counsel argued that the "real question" before the court was whether Father was an "asset" or a "detriment" to Minor; that the answer to that question did not depend on Minor but instead on Father; that Minor has a half-sibling, and thus terminating Father's parental rights would also result in Minor losing a sibling relationship; and that with Father's counsel's permission, Minor's counsel had met with Father and concluded Father had the potential to make a "positive" impact in Minor's life.

Minor's counsel further argued that Jako was in a position to answer these questions; that these type of cases—in which one parent moves under section 7822 to terminate the rights of the other parent—were "outlier[s]" because the Agency's position was it was "better" to have a father "than no father unless he is a [section] 7825[7] father"; that in counsel's 40 years of practice, this was only the third time he had been involved in a case involving termination of parental rights when no adoption was pending; that in his

---

7    Section 7825 provides in part: "(a) A proceeding under this part may be brought where both of the following requirements are satisfied:  [¶]  (1) The child is one whose parent or parents are convicted of a felony.  [¶]  (2) The facts of the crime of which the parent or parents were convicted are of such a nature so as to prove the unfitness of the parent or parents to have the future custody and control of the child."  Subdivision (b) of this statute applies when a child is conceived as a result of rape and the father is convicted of that violation.  (§ 7825, subd. (b).)  Other provisions also allow for a proceeding to be brought under the FFCC.  (See e.g., §§ 7823 [neglected or cruelly treated child]; 7824 [parents suffering from disability due to alcohol or controlled substances]; & 7826 [parent declared developmentally disabled or mentally ill].)  None of these provisions apply in this case.

14

view, Mother had a "big" hill "to climb to show this father is, per se, a detriment to the child"; and that if Mother had evidence of detriment, he would "welcome" its presentation.

In light of the Agency's agreement to supplement the October 30 report, the juvenile court reconsidered its previous order, found that Jako was "competent" and "qualified" to provide additional information to meet the requirements of section 7851, and ordered her to "follow up and address the points laid out in sub[section] (b), section (1) through (4)" of the statute. Jako agreed to supplement her report, noting her next interview of Minor would likely be "very delicate" because it was obvious from the first interview that Minor did "not know about these proceedings, per se, the very specifics of them." The court repeated that whatever recommendation the Agency made in its supplemental report was "just that, a recommendation"; and that the court would decide the case based on the totality of the evidence.

### 4. The Agency's April 9, 2024 Supplemental Report

The Agency's supplemental report continued to recommend dismissal of the Petition. Jako conducted a second, in-person interview with Minor on March 15. The day before the interview, at Jako's request, Mother talked to Minor about Father. To facilitate this discussion, Jako provided Mother with a copy of section 7851.

During the interview, Jako confirmed that Minor understood what the word " 'termination' " meant. Jako explained every child has two biological parents. At that point Minor referred to Father as his "male parent," and stated he did not plan on meeting the "male parent" or having any relationship with him. When Jako reminded Minor of Skype visits he had had with Father for "several year[s]," the Minor responded he could not remember talking to anyone on Skype.

15

Jako next explained the nature of the Petition. Minor responded he was "okay with the termination process," adding he did not like to see Mother "stressed out" like this. Jako informed Minor he had an attorney who was his "voice in court" and whose job was to represent him and his best interests. She also informed Minor he could attend the trial if he wanted.

Minor then asked Jako several questions including whether she had met the "male parent" and what she knew about the "male parent." During their conversation Minor ostensibly learned for the first time that he had a half sibling. The interview ended with Minor stating it was a "good idea to terminate the male parent's rights." Jako concluded Minor had a good understanding of the proceedings, but she was unable to explain to Minor "why" Mother had filed the Petition.

### 5. Minor's Testimony

Minor testified remotely without either parent being present, although each parent's counsel was present and his testimony was read to the parties at its conclusion. Minor's understanding of Father's "rights" was that Father wanted to "meet" him; and Minor thought it was "great" and "the best thing that could happen" if the "male parent's" rights were terminated. When asked why, Minor explained the "male parent" was "a scary stranger that tried to kidnap me" and "maybe would have taken me away from my mom forever, and he didn't listen to the police when they were there."[8] Minor also described the "male parent" as a "monster," and said he was having trouble

---

[8]  Minor apparently was referring to an incident in August 2015 when he was two years old, after Mother and Minor traveled to Michigan and Father missed visitation time. On their return and to make up this time, Father told Mother he was keeping Minor overnight. Mother called the police, who allowed Minor to remain with Father. He returned Minor the next day.

falling asleep at night because he lived in "fear" of what was going to happen to him if the "male parent" tried to kidnap him again.[9]

Minor testified the "male parent" did not "pay" for him, did not "love" him, and instead "hate[d]" him. When questioned how he knew these things, Minor stated Mother had told him this the day before. Minor claimed to have a "vague" memory of his alleged kidnapping, explaining he was "really scared" and "crying a lot" when it happened; and that the day before, Mother had confirmed it was the "male parent" who was responsible.

Minor did not know his legal name included the "male parent's" last name. Minor also did not recall moving from San Diego to Michigan, and the only thing he remembered about San Diego was the "kidnapping" incident, which memory "still remain[ed] strong in [his] heart." Mother never shared with Minor any nice things about the "male parent" or any other details, and Minor was unaware that the "male parent" loved him and wanted to spend time with him. Minor, however, had no interest in seeing what kind of person the "male parent" was, and refused to keep an "open mind" if they met because Minor would be "traumatized."

### 6. Other Testimony

Jako retook the witness stand and was questioned about the April 9 supplemental report. Jako testified it was in Minor's best interest to dismiss the Petition, which opinion she claimed was similar to her original recommendation. She found the second interview with Minor "enlightening," as he now referred to Father as his "male parent" and made clear he had no interest in meeting Father.

_____

[9] The juvenile court found there was no evidence to support Minor's statements that Father did not care about him and/or tried to kidnap him.

Jako opined that Mother had influenced Minor's testimony. Jako noted that during the second interview Minor never used the words "hate" or "kidnap" when referring to Father. This was all new information to Jako that came out in testimony after this interview.

Jako further opined that Minor has experienced trauma, as he had learned only a few weeks ago about Father and was still processing this new information; that as a result, she recommended therapy for Minor for him to "create his own opinions and feelings about it"; and that, while in the short term the trauma he's been exposed to might be diminished if the juvenile court granted the Petition, in the long term that could change and potentially lead to "disaster" for Minor.

Mother testified she did not tell Minor about Father until Jako asked her to do so, and previously did not mention Father "because the youth never asked about his father." When asked what Mother shared with Minor, Mother testified she merely asked Minor questions from section 7851.[10]

Father testified between 2016 and 2018 he was in custody with ICE, after Mother attempted to have him deported; that during his detention he and paternal grandmother attempted to contact Minor; that between September 2021 and February 2023, he attempted to send Minor cards, gifts,

[10]   In its August 8 Final Ruling and Order, the juvenile court found Minor's testimony about Father was based on what Mother had told the child, as opposed to what she had asked him; that Mother's testimony she never said anything "bad" about Father was "false"; that Mother felt it was an "attack on her" when Father sought to visit Minor; that Mother was "primarily focused on her needs as opposed to the youth's needs"; that "Mother's perspective has contributed to the difficulty of the youth having a relationship with the father"; and that it had "concerns" about Mother's credibility given that Minor learned about "a 'male parent' from the mother, the night before he was to testify," leading the court to conclude she had "coached the youth in his testimony."

and letters; that every time he attempted to modify custody and visitation Mother responded by filing an FFCC petition; that he has a pending request for order to modify custody and visitation in the stayed dissolution case and was willing to participate in conjoint therapy; that he decided to terminate the Skype calls with Minor because they were counterproductive, as Minor would not look into the camera and appeared disinterested; and that he needed a court order to obtain Minor's medical information and only learned Minor was being homeschooled when he traveled to Michigan to oppose Mother's petition to change Minor's name.[11]

Amrita T., the mother of Father's second child, testified Father was "dedicated and devoted" to their daughter. Amrita hoped there could be a sibling relationship between Minor and her daughter, and confirmed Minor would not meaningfully participate in the Skype calls with Father. The juvenile court found Amrita credible.

## C. *Analysis*

Mother contends the juvenile court erred by failing to replace the Agency with a new investigator to prepare a new section 7851 report. She claims the Agency's supplemental report did not remedy the error because: (1) its investigation was allegedly inadequate, as Jako merely spoke to the parties and took down their positions "rather than conducting any sort of investigation into *contested facts*" (italics added); (2) Minor's best interests were not considered due to its policy of recommending the denial of a section 7822 petition when there is no pending adoption; and (3) the reports,

---

[11] The juvenile court found Father to be credible in trying to establish contact with Minor; and his testimony provided "context as to the procedural posture of the family law proceedings as well as his participation in said proceedings."

in any event, did not meet the requirements of section 7851.  We are not persuaded.

First, the law is clear that *before* a child's best interests are considered in a section 7822 petition, there first must be a finding—based on clear and convincing evidence—that the non-petitioning party voluntarily intended to abandon the child.  (*In re Baby Boy S.* (1987) 194 Cal.App.3d 925, 933 (*Baby Boy S.*) [this court concluded the juvenile court did not err in failing to consider the best interest of the child in the adoptive parents' petition to have the child freed from parental custody and control due to abandonment because, "[a]bsent intent on the part of the parents to abandon the child, as the court found here, the best interests and welfare criteria are simply *not* applicable" (italics added)].)

Here, Mother does not challenge the juvenile court's finding Father had no intention of abandoning Minor.  And even if she had, we would conclude the court's finding on this issue was amply supported by the record, including:  (1) the 46-page register of actions in the dissolution case, and Father's pending request for order seeking to modify custody and visitation in that action; (2) his attempts to visit with Minor and agreement to engage in conjoint and/or reunification therapy; (3) his efforts to access Minor's medical information, which required a court order; (4) his decision to travel to Michigan to oppose Mother's petition to change Minor's name; and (5) Mother's ongoing attempts to thwart his relationship with Minor, among other evidence.  (See *K.M., supra*, 102 Cal.App.5th at p. 914; *A.B., supra*, 2 Cal.App.5th at p. 924.)

Second, we conclude from the plain language of section 7851 that an investigator is not required to investigate "contested facts," as Mother argues, in order to comply with the statute, including what is in a child's best

20

interest. (See *In re Brandon H.* (2024) 103 Cal.App.5th 1277, 1282 [in interpreting a statute to ascertain the Legislature's intent, " ' "[w]e begin our inquiry by examining the statute's words, giving them a plain and commonsense meaning" ' "; " ' "[i]f the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend" ' "].)

As noted, a section 7851 report requires the following statements: (1) the child was informed of the nature of the proceedings to end parental custody and control; (2) the child's feelings and thoughts concerning the proceeding and (3) attitude toward his or her parent or parents; and (4) the child was informed of the right to attend the hearing. (§ 7851, subd. (b)(1)–(4).)

Based on our independent review of the record (see *A.B., supra,* 2 Cal.App.5th at p. 924), we conclude the Agency's October 30 report, as supplemented, satisfies section 7851, subdivision (b)(1) through (4). In fact, we note the Agency reports go beyond what is statutorily required, inasmuch as the October 30 report includes long summaries of Jako's interviews of the parties, in addition to Minor's two interviews that are the subject of subdivision (b)(1) through (4). (See *Noreen G., supra,* 181 Cal.App.4th at p. 1380 [section 7851 focuses "on obtaining the 'child's feelings and thoughts' on the proceeding"].)

Third, Jako admitted during her first round of testimony that she may have gotten "tripped up" when testifying regarding the Agency's policy of recommending denial of an FFCC petition when there is no pending adoption. Although the juvenile court initially found this testimony concerning, the court ultimately concluded the Agency could supplement its October 30 report to ensure compliance with section 7851, after the Agency's counsel

represented that the Agency had in fact considered Minor's best interests in recommending denial of the Petition. (See § 7851, subd. (a).) And, when Jako retook the stand, she reiterated that the Agency had in fact considered the best interests of Minor in its original and supplemental reports. The court found Jako credible and credited her revised testimony, as was its right as trier of fact. (See *In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1372 ["it is the exclusive province of the trier of fact to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends"].)

Fourth, we note the Agency's "policy" is not without support. Indeed, the overarching purpose of the FFCC is "to serve the welfare and best interest of a child by providing the stability and security of an *adoptive* home when those conditions are otherwise missing from the child's life." (§ 7800, italics added.) We recognize Mother had standing as an "interested person" to bring a section 7822 petition. (See e.g., *T.P. v. T.W.* (2011) 191 Cal.App.4th 1428, 1430 [reversing judgment denying the mother's petition to terminate the parental rights of the child's father for lack of standing because the mother was an "interested person" within the meaning of section 7841, subdivision (a)[12]].) But in the current case we question whether the purpose of the FFCC is furthered when Minor *already* was living in a "stable and secure" home with Mother and, as the Agency recognized, no adoption was pending (§ 7800); and when the sole purpose of the Petition was her third attempt to terminate Father's parental rights in the *juvenile* court while his

---

[12]   Section 7841, subdivision (a) provides:  "An interested person may file a petition under this part for an order or judgment declaring a child free from the custody and control of either or both parents."  Subdivision (b) of this statute further provides an " 'interested person' is one who has a direct interest in the action."

22

pending request for order to modify custody and visitation was stayed in the *family* court.  (See *In re Kristine H. v. Lisa R.* (2005) 37 Cal.4th 156, 166 ["public policy favor[s] that a child have two parents rather than one"].)

Fifth, even assuming the Agency investigative reports did not comply with section 7851, as Mother argues, no prejudice is apparent from the record and she demonstrates none.  (See *Noreen G., supra*, 181 Cal.App.4th at p. 1380 [noting a court is "not stripped of jurisdiction if an *incomplete* report is filed," as compared to when no report is filed or no investigation was done]; *Valerie W., supra*, 162 Cal.App.4th at p. 14 [deficiencies in an assessment report go to the weight of the evidence].)

We note the juvenile court repeatedly indicated that the Agency reports were just part of the totality of the evidence it would consider in ruling on Mother's Petition, and that the Agency's recommendation regarding the disposition of the case was "just that, a recommendation."  Based on its detailed 31-page August 8 Final Ruling and Order, which included myriad findings and credibility determinations, as well as an extensive summary of *each* of the nine witnesses who testified, it is abundantly clear that the court considered all the evidence, as opposed to just the Agency's reports and recommendation, in determining Minor's best interests.

Mother, however, suggests that if the juvenile court had appointed a new investigator the outcome of the case "could have" been different.  But in the absence of facts from the record, we are relegated to merely speculating what "might have meant," which we cannot and will not do.  (See *K.M., supra*, 102 Cal.App.5th at p. 914; accord, *In re Rashad D.* (2021) 63 Cal.App.5th 156, 164 [potential adverse consequences that are "too speculative " will not justify appellate review].)  And the record shows that the court did not place any restrictions on Mother to present all relevant

information in support of her Petition.  For all these reasons, we reject this claim of error.

## IV. The Juvenile Court Properly Considered Minor's Best Interest In Denying the Petition

Mother contends the juvenile court erred when it considered the "least detrimental alternative" standard in determining Minor's best interests.  We disagree.

First, as we have noted, the juvenile court was not even required to consider the best interests of Minor as a result of its finding that Father had no intention of voluntarily abandoning Minor.  (See *Baby Boy S., supra*, 194 Cal.App.3d at p. 933 ["[a]bsent intent on the part of the parents to abandon the child, . . . the best interests and welfare criteria are simply not applicable"].)  Thus, we conclude any purported error regarding the best-interest standard used by the court is harmless.

Second, the juvenile court, in any event, considered the best interests of the Minor based on the totality of the evidence and the credibility of the parties.  The court took into account Minor's "social, emotional, physical and mental well-being," found he was "well-adjusted" "with adequate family support, but burdened by his mother's feelings toward the father having contact."  The court "also found the youth was heavily influenced by the mother regarding his father," referring to him as his "male parent," "noncaring," and a "monster"; and that this testimony was from the view of Mother and not Minor.

Confronted with the unique circumstances of this case—in which a 10-year-old child has just learned he has a half-sibling, the identity of his father, and his father's longstanding desire to reunite with him as opposed to "kidnap" him—we applaud the juvenile court for suggesting alternatives to

24

termination of Father's parental rights when considering Minor's best interest.[13] (See *A.B., supra*, 2 Cal.App.5th at p. 924 [whether to terminate parental rights " 'lies in the first instance within the discretion of the trial court, "and will not be disturbed on appeal absent an abuse of that discretion" ' "].) We thus reject this claim of error.

## V. The Juvenile Court Properly Excluded Evidence From the Dissolution Case

Mother next contends the juvenile court abused its discretion when it quashed the civil subpoena and excluded the FCS counselor's February 16, 2023 report (FCS Evidence). We disagree.

### A. *Additional Background*

In their motion, the FCS counselor and the Superior Court of California, County of San Diego (Nonparties) argued the law limited disclosure of the FCS report to "only certain statutorily authorized individuals"; there was "no right to examine an FCS counselor outside of a child custody proceeding"; and such a proceeding was "entirely different" than an FFCC proceeding.

Father argued the FCS report was irrelevant and based on hearsay, and the parties, in any event, were set to testify, rendering the FCS Evidence cumulative. Mother argued the report was relevant to show Father's alleged lack of efforts to engage Minor during the relevant time period and could be filed under seal, but admitted the FCS Evidence would not "resolve" the case.

---

13    The juvenile court's suggestions included "requiring the parents to complete a high-conflict parenting course, trauma-informed individual therapy for the youth outside the presence of the mother to help the youth process the recent knowledge that he has a father and a sibling, and conjoint therapy by a therapist other than the youth's individual therapist."

In granting the Nonparties' motion, the juvenile court found the FCS Evidence was irrelevant, ruling the child custody and FFCC proceedings were "entirely different"; that even if somewhat relevant, the FCS Evidence would lead to confusion of the issues and would be "cumulative" to the live testimony of the parties, which it found would be the "best evidence"; and that custody and visitation provisions in the family code were not to be considered in an FFCC proceeding.

## B. *Guiding Principles and Analysis*

"In ruling on the admissibility of evidence, the trial court is vested with broad discretion. ' "[T]he court's ruling will be upset only if there is a clear showing of an abuse of discretion." [Citation.] " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. . . .' " ' [Citation.]." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 911 (*Cole C.*).)

We conclude the juvenile court properly exercised its discretion when it granted Nonparties' quash motion and excluded the FCS report. (*Cole C., supra*, 174 Cal.App.4th at p. 912.) Although sections 3000 et seq. and 7800 et seq. both require a court to make orders in the best interest of a minor (§§ 3020, subd. (a) [custody and visitation] & 7800 [FFCC]), the purpose behind the two statutory schemes are vastly different: section 3020 governs the "physical or legal custody or visitation of children" (§ 3020, subd. (a)), with the aim of ensuring that "children have frequent and continuing *contact* with both parents after the parents have separated or dissolved their marriage" (*id.*, subd. (b), italics added). In contrast, the purpose of an FFCC proceeding is to have "a minor child declared *free* from the custody and control of either or both parents." (§ 7802, italics added.)

26

"The issue of the relevance of evidence is left to the sound discretion of the trial court, and the exercise of that discretion will not be reversed absent a showing of abuse. That discretion is only abused where there is a clear showing the trial court exceeded the bounds of reason, all of the circumstances being considered." (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 32.) Based on the different purposes of the two statutory schemes bearing on a child's best interest, we conclude the juvenile court did not abuse its broad discretion in ruling to exclude the FCS Evidence. (See *ibid.*; accord, *Cole C., supra*, 174 Cal.App.4th at p. 911.)

In addition, we conclude even if marginally relevant, the juvenile court properly exercised its discretion when it found the FCS Evidence would lead to confusion in the FFCC proceeding (see § 7807, subd. (a) [section 3020, and arguably an FCS report generated under that section, do *not* apply in an FFCC proceeding]); and would be cumulative to the parties' testimony (see *Horn v. General Motors Corp.* (1976) 17 Cal.3d 359, 371 [citing Evid. Code, § 352 in concluding the trial court "has discretion to refuse to admit cumulative evidence"]; accord, *Nevarez v. Tonna* (2014) 227 Cal.App.4th 774, 785 [trial court did not abuse its discretion by refusing to admit certain evidence when the defendant testified to the same evidence]).

Finally, even if the juvenile court erred in failing to admit the FCS Evidence, we conclude it is not "reasonably probable" a result more favorable to Mother would have been reached absent the purported error. (See *In re Jordan R.* (2012) 205 Cal.App.4th 111, 134 (*Jordan R.*) ["To the extent an alleged error violates state evidentiary law, 'even where evidence is improperly excluded, the error is not reversible unless " 'it is reasonably probable a result more favorable to the appellant would have been reached absent the error.' " ' "].)

As we have noted, in denying the Petition the juvenile court considered the totality of the evidence, including the testimony of Mother and Father and many other witnesses, myriad exhibits, and extensive argument of counsel, including Minor's counsel, who, in advocating for his client, argued it was "not even close" that Minor's best interest was to have Father in his life. For this separate reason, we conclude any error in failing to admit to admit the FCS Evidence was harmless. (*Jordan R., supra*, 205 Cal.App.4th at p. 134.)

## DISPOSITION

We affirm the juvenile court's August 8 Final Ruling and Order.

O'ROURKE, Acting P. J.

WE CONCUR:

IRION, J.

DATO, J.